LA FRENTZ et al. v. BLAKE.

LA FRENTZ et al. v. JOHNSON et al.

Nos. 7360, 7361.   Decided December 22, 1949.   (212 P. 2d 673.)

Rehearing Denied March 20, 1950.

See 8 C. J. S., Bailment, sec. 3. Contract of sale, or bailment, see note, 52 A. L. R. 589. See, also, 46 Am. Jur. 649.

*Cline, Wilson & Cline,* Milford, for appellants.

*Henry E. Beal,* Richfield, for respondents.

LATIMER, Justice.

These two actions in claim and delivery were instituted by plaintiffs to recover possession of two gas tanks held by the defendants. They involve the same legal principles and substantially the same state of facts. In view of this and the fact that they were consolidated for trial and appeal, we will dispose of them in this one opinion.

At the time of the commencement of the action the plaintiffs were co-partners in a liquid gas company with their headquarters at Cedar City, Utah. The defendants Morris Johnson and Loraine Johnson were a co-partnership doing business at Circleville, Utah under the firm name and style of Horseshoe Cafe. The LaGas Company, or Erwin Lay,

was a dealer selected by plaintiffs to represent them in the selling and distribution of liquid gas appliances and equipment.

On either the 7th or the 9th day of December, 1946, the plaintiffs entered into a written dealer's contract with the LaGas Company at Circleville, Utah. Neither the contract nor the evidence disclose the legal nature of this company, but certain of the endorsements on checks made payable to the company suggest that it was a company operated by Erwin Lay and one Wilford M. Davis as co-partners. However, in view of the fact that the parties have treated the company as the alter ego of Erwin Lay, we shall do likewise and disregard the company entity.

Some time prior to, or in June, 1947, defendants Morris Johnson and Loraine Johnson entered into negotiations with Lay for installation of one 320 gal. liquid gas tank. This tank was installed on Johnson's premises and Mr. Johnson fixes the date as June 16, 1947. There is a check in evidence in the amount of $556.83 which bears date of June 16, 1947. This check was made payable to LaGas Liquid Gas Company and cleared through the bank at Richfield, Utah, on June 17, 1947. There is likewise, a check in the amount of $100 bearing the same date made payable to the same company and clearing the same bank on June 17, 1947. A receipt of these two sums shows a credit of $556.83 on the gas installation and $100 on a steam table. Between this date and December 9, 1947, the Johnsons paid to Lay the sum of $1,000.83 which sum Johnson claims to have paid for merchandise purchased from Mr. Lay. Included in these payments is the full purchase price of the gas tank.

The defendant Melvin Blake, likewise, entered into negotiations with Lay for the installation of a 500 gal. liquid gas tank. The exact date this tank was delivered and installed was not fixed but Blake testified that it was in either February or March of 1947. He claims to have agreed upon

a purchase price of $350 and to have paid the same to the Richfield Commercial Bank to apply on the indebtedness of Lay. The record establishes that the Richfield Commercial Bank was loaning money to Lay and was operating with him under some type of a floor plan arrangement. Plaintiffs were aware of this arrangement as some of their statements were sent direct to the bank and certain payments made by the bank were received by them. There is no dispute in the evidence as to the payment having been made by Blake.

The franchise agreement between plaintiffs and Lay provided for a right of cancellation or termination by one party giving the other party 60 days written notice of election to cancel. On June 23, 1947, Lay, by registered letter, notified plaintiffs that he was terminating the contract pursuant to the provisions of that paragraph.

There are two combination agreements which plaintiffs rely on to strengthen their claim of ownership and these were obtained by the plaintiffs some time during the year 1947. One of the agreements is dated the blank day of June, 1947, and the parties are designated as LaFrentz Liquid Gas Company and defendant Morris Johnson. The agreement is in two parts. The substance of the first part is that Johnson will purchase all liquid petroleum gas used by him on his premises from the plaintiffs. The second part provides that he agrees to rent one 320 gal. cylinder LaFrentz LaGas dispensings set and to pay the labor and installation charge of $250 and a rental of *none* dollars per year. This contract is not signed by Morris Johnson or by the partnership, but is signed by Loraine Johnson, individually. The other combination agreement which is substantially the same is dated the blank day of December, 1946. The parties to this contract are Robinson and Blake, parties of the second part, and La Frentz Liquid Gas Company as party of the first part. Both agreements are on printed forms and the only difference in the two is that there is inserted in the blank space in the rental part of the

Blake agreement a 500 gal. cylinder LaFrentz LaGas dispensing set and a labor and installation charge of $350. The blank space for yearly rental also has been filled in with the word "none."

The evidence in regard to the time of execution of the combination agreement between LaFrentz Liquid Gas Company and Morris Johnson shows that the date of signing was subsequent to the purchase of the tank from Lay, and, at least, one day subsequent to the time a substantial portion of the purchase price was paid by the Johnsons. The date on the combination agreement between Robinson and Blake and LaFrentz Liquid Gas Company is obviously in error. While the evidence does not disclose whether it was before payment was made by Blake, plaintiff concedes it was executed at least a couple of months subsequent to the month of December, 1946.

There are certain invoices, statements and delivery slips showing the transaction between the LaFrentz Liquid Gas Company and the LaGas Liquid Gas Company, or Erwin Lay. The gas tanks herein involved or similar ones are included on these statements and invoices and payments for them appear to have been made by Lay. After termination of the agreement and on or about July 23, 1947, a check drawn by Lay in the amount of $259.63 was made payable to the LaFrentz Liquid Gas Company with a notation thereon "payment in full for all of the LaFrentz Accounts." The check was held until November 23, 1947, and was then cleared through the bank. The notation on the check was scratched off some time after being delivered to the LaFrentz Liquid Gas Company. The record is silent as to the full and final settlement of the accounts between LaFrentz Liquid Gas Company and Lay, except as indicated, but there is no issue made by plaintiffs that the amounts due by Lay for the purchase or rent of the tanks have not been paid. Moreover, the evidence is not in dispute that the defendants have paid to Lay the full amount of the contract prices

for the tanks and their installation, regardless of whether the transactions were sales or leases of the equipment.

After a trial on the merits, the court below found the defendants were the owners of the tanks by virtue of having paid the full purchase price and entered judgment to this effect. In appealing from the judgment as entered, appellants principally contend that the conclusions of law and decree are not supported by any findings of fact. The findings of fact are lacking in many respects, but this is of little importance to appellants if the evidence is such to establish that Lay acquired title to the tanks and sold them to defendants.

We view the original franchise agreement differently from the construction contended for by appellants and consider the provisions for leasing more restricted in its scope. There are several provisions which deal with the rights of Lay to dispose of the merchandise and the agreement does not mention or use the word "lease" in connection with his right to deal with the property. The following quoted provisions mark the boundaries of Lay's authority:

"1. Distributor does hereby constitute and appoint dealer as dealer for distributor in *handling, selling* and *dealing* in liquid gas and/or gas burning equipment which shall during the life of this agreement *be sold by dealer in the following territory * * *.*

"2. Dealer agrees that he will not purchase from anyone except through distributor any liquid gas and/or gas burning equipment *which dealer shall sell directly or indirectly in the territory above described.*

\* \* \* \* \*

"4. Distributor agrees to use his best efforts to supply dealer with all liquid gas and/or gas burning equipment which dealer *may be able to sell or dispose of* during the term of this Agreement in the territory above designated.

"5. Dealer agrees to maintain a place of business satisfactory to distributor for use in storing and displaying gas burning equipment and merchandise *which he shall purchase through distributor for resale.*"

The above provisions all indicate a purchase and resale agreement without any mention being made of a leasing arrangement. Accordingly if there is a limit on Lay's right to purchase or sell, or any retention of title in the plaintiffs, it must be found in paragraph 3, which we quote:

*"Dealer agrees to lease* from distributor *all tanks* and appurtenant equipment *which shall be needed and used by him for the storing and keeping of liquid gas* which shall be stored or kept on hand for sale by the dealer during the life of this Agreement." (Italics added.)

This paragraph places some restriction on some of the equipment to be obtained by Lay but as we interpret the provision it does not deal with any equipment to be purchased by or leased to third parties. If we substitute names for designations we find the paragraphing requiring Lay (dealer) to lease from plaintiffs (distributors) all tanks and equipment needed and used by Lay for the storing and keeping of liquid gas which is to be stored and kept on hand for sale by Lay. We find no limitation of any kind in this provision which can be applied to equipment or merchandise obtained by Lay for use of his customers.

This construction is fortified by the acts and conduct of Lay and plaintiffs during their short relationship. There were some dealings between them in connection with the installation of a three-thousand gallon storage tank in Richfield, Utah. However, the invoices charging the five hundred and three hundred and twenty gallon tanks to Lay meet the tests of a contract of sale. On certain invoices billing out gas cylinders there is a specific reservation of title in plaintiffs, but not so on invoices dealing with tanks. On the latter, definite terms and conditions are fixed, no reservations are made and title to the items designated on the invoices appears to have passed at the time of sale. Payments therefor were to be made in the usual course of trade.

It hardly comports with ordinary business transactions for a dealer to intend to lease articles for the purpose of sub-leasing, when he is required to pay the full value thereof on a cash or 30 day credit basis. Under such an arrangement the dealer would pay the same purchase price whether he or his customers retained possession for thirty days or thirty years. If this construction is correct, then Lay intended to lease the equipment under a most indefinite and uncertain arrangement. There is no leasing period prescribed, a price has not been agreed upon, a periodic payment schedule is not contemplated and other conditions generally made definite in leasing contracts are unmentioned. Such a construction would be at variance with those principles which require a contract to be construed so as to operate fairly and justly between the parties.

One additional reason which argues strongly against appellants' contention is that the franchise agreement requires Lay to maintain a place of business for use in storing and displaying merchandise for purposes of resale. To interpret the contract to be a leasing arrangement for tanks would permit Lay to mix salable with unsalable merchandise; to publicly exhibit all property for sale; and, to hold himself out as a dealer with the right to sell the tanks. Innocent parties could thus be led into believing that they were doing business with and purchasing from one who had a right to sell as there would be little possibility of them being informed that the property displayed and dealt with by Lay was not owned by him. Rather than construe the contract to permit the parties to prepare a trap for innocent third persons, we prefer to construe it to be an honest attempt to grant Lay the right to purchase and sell all equipment except that used by him.

Appellants press the point that the subsequently executed combination agreements signed by the defendants bind them to a leasing agreement. Under the circumstances of this

case, these agreements are of no legal effect. In the first place, there is a great deal of informality about their execution. Both are uncertain as to dates of execution and in one instance the month is admittedly wrong. The agreement supposedly determining the rights of Morris Johnson and Loraine Johnson designates Morris Johnson the party of the second part and it is unsigned by him or by any one claiming to represent him personally.

Were we only dealing with informalities we might be confronted with a more difficult situation. However, we have matters of substance which defeat plaintiffs' claim. Both agreements were executed after title to the tanks had been acquired by Lay. Neither of the defendants had any dealings with the plaintiffs for the purchase of the equipment, or otherwise, until these documents were signed. The plaintiffs were total strangers to any transaction between Lay and the defendants until after title had passed through Lay to the defendants. If, as we hold, Lay purchased the tanks and obtained title from plaintiffs, then he had a right to make an out-right sale to the defendants. Lay, having sold the tanks without reserving title or right to possession, and both he and plaintiffs having received payments for them, neither had any title or right to possession. By merely obtaining the signatures to the documents plaintiffs did not reacquire title to the tanks as there is not a suggestion in the record that there was any consideration running from plaintiffs to defendants for the signing of these contracts. The defendants were not indebted to the plaintiffs and if the former obtained title to the tanks from Lay, the latter gave nothing of value for the signed statement that the property was rented and the title remained in plaintiffs. The belated efforts by plaintiffs to change the sale to a lease were without legal effect.

The judgment is affirmed.

WADE and WOLFE, JJ., concur.

PRATT, Chief Justice (in dissent).

As stated in the prevailing opinion, the findings of fact entered by the lower court are lacking in many respects. I add to that, this: They are so lacking that one is unable to determine upon what theory the lower court decided the case. This is of particular importance in view of the fact title to the tanks was stipulated, at the beginning of the trial, to have originally been in plaintiffs. The questions then arise: Did defendants buy the tanks? Did they buy them from plaintiffs through the ostensible agency of Lay; or did they buy the tanks from Lay? If the latter, then what title did Lay have to convey to them? If Lay had no title was there an estoppel? I am, of course, familiar with the principle of estoppel illustrated in the case of *Harrison* v. *Auto Securities Co.,* 70 Utah 11, 257 P. 677, and annotations 57 A. L. R. 388. There must, however, be an estoppel. 46 Am. Jur. 620, Sec. 458, and page 629, Sec. 464.

Let us start first with the methods of furnishing this liquid gas. The tanks are installed in the customer's place of business, and are filled and refilled by plaintiffs, not by Lay—at least until the latter terminated his contract with plaintiffs and went into the gas distribution business for himself. The franchise contract uses terms in its paragraph 3 (quoted in the prevailing opinion) that indicate that Lay stored gas for delivery to customers, and it was the tanks used for such storage that were the only tanks under lease arrangement between plaintiffs and Lay. However, there is no evidence that Lay stored gas at all, or that he possessed tanks for that purpose. In his testimony there is nothing as to tanks other than the two accounted for as delivered to the defendants in these actions. Apparently they were the tanks used for storage purposes and were on the the defendants' premises and were to be filled by plaintiffs.

I use the paragraph immediately above as an introduction for the reason that the prevailing opinion contemplates

tanks delivered to customers as saleable articles under the franchise contract and impliedly limits leased tanks to those used on Lay's premises—of which there appears to be none. In spite of such an interpretation of paragraph 3 being within the realm of reasonableness in the light of its wording, I am impressed with the fact that the parties did not so interpret it; and that in fact, Lay did not sell the tanks, nor did the defendants intend to buy them.

One must concede, of course, that a party may give such apparent authority to his agent as to permit that agent to convey good title from the principal to the purchaser; but that is not the theory upon which this case was tried. Neither Mr. Johnson, nor Mr. Blake in his testimony gave any indication that he thought he was buying the tanks from the plaintiffs through the agency of Lay. Mr. Blake testified that he paid the Richfield Commercial Bank. That bank was representing Lay, as he did not have sufficient funds to support the deal without the bank's aid. Mr. Johnson testified:

"I have receipts and checks in my pocket to show that I bought $1,100 worth of equipment from Mr. Lay. I bought the tank, and *it was my understanding it was mine*  \*  \*  \*" (Italics added. He seems doubtful.)

The checks submitted by Mr. Johnson are all made payable to Lay or his company. On one check is written "on gas set up." This check is for $556.83, and Johnson claims that it includes the tank price; but there is nothing to indicate that it was for the price of a tank any more than for its installation and rental. The LaFrentz sales slip 00991 made out by Lay is also uncertain in that particular. So far then, we have no apparent attempt on the part of either Blake or Johnson to claim that they bought the tanks from plaintiffs, through Lay, as agent.

Mr. Lay was called as a witness. I desire to quote part of his testimony:

"Q. And isn't it a fact that the first invoice of material which was billed to you, consisted of certain cylinders? A. That's right.

"Q. With attachments, such as regulators, pigtails and switch-over valves and so forth? (See Exhibit 8 below) A. That's right.

"Q. Now, did you have any arrangement with the LaFrentz Company whether or not your method of acquiring possession and taking over tanks, such as this five hundred gallon tank and the three hundred gallon tank, was different from taking over the cylinders?

A. There was nothing said.

"Q. In other words, do I understand that the arrangement or deal, whatever it was between you and the LaFrentz people was the same concerning any equipment that was to be installed or refilled whether it be these one hundred pound cylinders or these larger tanks? A. So far as I knew there was no difference.

"Q. No difference, and whatever your deal was concerning one hundred pound cylinders would be the same type of deal and arrangement concerning other equipment, and these larger tanks, which were to be installed for customers use and to be refilled when empty? A. That's right."

Exhibit 8, I quote, except as to the list of 100 numbers apparently representing the numbers of each cylinder, of the 100 pound cylinders mentioned above:

"100—100# Cylinders complete with regulators, pigtails and Switch-over valves $150.00

"100 Cylinders of Gas A 4.00 per Cylinder $400.00

\*     \*     \*     \*     \*

"The 100# cylinders remain the property of the LaFrentz Liquid Gas Company, Cedar City, Utah, who are the distributors for the dealer known as the LaGas Company, located at Circleville, Utah.

"Signed: Ervin C. Lay
"Signed: F. H. LaFrentz"

It is to be noted that even though these cylinders remain the property of the LaFrentz Company they are listed at

a total price of $1,500. In other words, the dealer is charged with the cylinders at a given price. The effect of Lay's testimony is that the same applied to the tanks.

Now let us consider Invoice No. 2593, which is part of defendant's Exhibit I, The exhibit is quoted:

|  | | Dealer | Retail |
|---|---|---|---|
| "1 | 500-gallon tank No. D-4053 ............... | $250.00 | $ .......... |
| 6 | Lbs. Bu-Seal @ $1.25 3 lb. can ............ | 2.50 | .......... |
| 1 | R-500 Roney Regulator ................... | N/C | .......... |
| 1 | 10 gallon tank No. 4032 .................. | N/C | .......... |
|  | 10 gallons propane ....................... | .40 | .......... |
| 2 | Instant Steam Boilers @ 168.00 ea. ........ | 336.00 | 210.00 ea. |
| 1 | 20-gallon Smith-Milwaukee Hot Water | | |
|  | Heater .............................. | 63.29 | 83.39 |
| 1 | Eagle Gas Range ....................... | 96.22 | 128.30 |
| 1 | DeLuxe Tappan Range ................... | 179.78 | 239.19 |
| 1 | O'Keefe & Merritt Range (Combination) ... | 197.68 | 259.25 |
| 2 | O'Keefe & Merritt Electric Clocks @ 22.50 ea. | 45.00 | .......... |
| 1 | 30,000 B. T. U. Panelray ................. | 77.17 | 102.89 |
| 1 | Southern Aire Heater ................... | 42.00 | 58.60 |
| 1 | 45,000 B. T. U. Warmolater Heater ........ | 117.60 | 156.80 |
|  | | 1407.64 | |

Signed: E. Lay

LaGas Liquid Gas Company"

Invoice No. 74 has two columns, too: "Dealers Cost" and "Retail For." Invoice No. 2598 after charging dealer 15c per foot for copper tubing says: "you chge. 25c per foot when using for installations."

These extracts from Exhibit I indicate that as to those articles which fall under the franchise contract as purchases for resale by the dealer, two prices are listed; one the dealers price and one the retail price. The tank has no retail price.

Considering Mr. Lay's testimony in the light of these exhibits and in the light of his franchise contract, it seems reasonable to say that he knew he was not purchasing title

to the tanks from plaintiffs. He thus had no title to pass to defendants if we conclude he tried to pass title to them.

Now, what about estoppel applied on a basis of giving a dealer apparent title to sell? Let us examine the "combination" agreements plaintiff had defendants sign. They recite that the buyers rent these tanks from plaintiffs. The Johnsons admitted in their pleadings that they were partners doing business as the Horseshoe Cafe. Johnson testified that in his absence his wife looked after the business. Three of the checks offered in evidence by Johnson in payment of Lay are signed "Horseshoe Cafe & Motel by Loraine M. Johnson." The "combination" contract speaks of Morris Johnson as "Buyer." Under Morris Johnson appears "Horseshoe Cafe" in pencil. Loraine Johnson signs as buyer. The tank in question is the one in controversy, claimed by the Johnsons. Quite aside from the question of whether or not the writing is a contract it seems clear that Loraine Johnson was signing as one of the partners. So far as Robinson and Blake are concerned, the "combination" agreement was made out to them as the R & B Cafe, and Blake in effect admits that the firm name was signed by Robinson. Are these instruments, then, not written admissions of ownership of the tank in plaintiffs? If so, can there be an estoppel if defendants knew that plaintiffs had title and Lay did not?

Furthermore, there is the evidence that plaintiffs kept the tanks in repair and painted the signs which read:

"This tank should not be filled by anyone other than the LaFrentz Liquid Gas Co."

If defendants owned the tanks, what was the purpose of the sign?

The statement in the prevailing opinion that we should interpret the franchise contract so that it cannot be a means of trapping innocent parties, is not appropriate to the issues of this case. Had defendants proved that they were of

the trapped class, they would, of course, be protected (see citations above) ; but I am not convinced that they have placed themselves within that class.

McDONOUGH, J., concurs in the dissenting opinion of PRATT, C. J.